### DE FOREST v. MEISSNER et al., and four other cases.

(Court of Appeals of District of Columbia. Submitted March 13, 1924. Decided May 5, 1924.)

Nos. 1638–1642.

**Patents ⊂⇒87—Evidence held not to show abandonment or lack of diligence on part of party who first reduces to practice.**

In an interference proceeding involving an invention of means for producing sustained electrical oscillations, comprising an oscillatory circuit having two electrodes in an exhausted receptacle, and a second circuit coupled thereto having a conducting body interposed between the electrodes, evidence *held* not to show abandonment or lack of diligence on part of party who was first to reduce to practice.

Appeal from the Commissioner of Patents.

Interference proceeding between Lee De Forest, Alexander Meissner, Irving Langmuir, and Edwin H. Armstrong. From the decision rendered, De Forest, Langmuir, and Meissner bring separate appeals. Decree reversed, and priority awarded De Forest.

Charles M. Thomas, Francis D. Thomas, and Melville Church, all of Washington, D. C., and S. E. Darby and S. E. Darby, Jr., both of New York City, for De Forest.

Alexander D. Lunt and H. E. Dunham, both of Schenectady, N. Y., for Langmuir.

Octavius Knight, of New York City, for Meissner.

William H. Davis, Thomas Ewing, and Willis H. Taylor, Jr., all of New York City, for Armstrong.

Before SMYTH, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. This interference comes here on appeal by the parties Langmuir, De Forest, and Meissner, from the decision of the Commissioner of Patents awarding priority to Armstrong; also appeals by De Forest against Meissner and Langmuir jointly, and against Langmuir, individually, for the invention set forth in the following counts:

"1. Means for producing sustained electrical oscillations comprising an oscillatory circuit having two electrodes in an exhausted receptacle and a second circuit coupled thereto having a conducting body interposed between said electrodes."

"2. Means for producing sustained electrical oscillations comprising an oscillatory circuit having two electrodes, a second circuit coupled thereto having a conducting body interposed between said electrodes, and means for varying the frequency of the produced oscillations."

"3. The method of producing electrical alternating currents which consists in causing current to flow in one of two coupled circuits and varying the flow of current in the first circuit by impressing the potential induced in the second circuit upon a conducting body interposed between two electrodes in the first circuit."

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The invention set forth in each of the applications is concisely described in the opinion of the Commissioner as follows:

"All the counts of all the issues involve the setting up of small current variations in one circuit, creating thereby corresponding variations in a second circuit, and feeding back these second circuit variations inductively into the first circuit to add their effect to the initial variations, which latter, thus reinforced, create and form greater variations in the second circuit, and these are, in turn, also inductively fed back to the first circuit to still further amplify the variations in such first circuit and these still further amplify those in the second circuit, and so on. The energy of the variations of each circuit reacts upon and increases that in the other circuit until a maximum sustained alternating current is finally produced, whose frequency can be controlled by varying the electric constants of the associated circuits."

The whole case, as here presented, turns upon the question of priority to be determined solely as a question of fact. The Commissioner of Patents, affirming a decision by the Board of Examiners in Chief, awarded priority to the party Armstrong. It may be stated at the outset that the voluminous record in this case is exceptionally free from contradiction or attempted impeachment of witnesses. Indeed, the whole record may be accepted as embracing a true statement of the facts involved in each case.

Especially are we impressed by the party Armstrong and his witnesses. We have no doubt but what he produced the invention at the time alleged, and did all the things attributed to him by the testimony, as set forth in this record. His earliest claim to a conception of this invention is October, 1912, followed by a witnessed sketch on January 31, 1913. This date antedates any time claimed by or available to either the party Meissner or Langmuir. These parties, therefore, are eliminated from further consideration.

This narrows the case to De Forest and Armstrong. It is clearly shown that De Forest was developing the idea involved in this invention in the early part of 1912, and it is claimed that the work culminated in a complete disclosure of the invention in August of that year. If this claim is sustained, De Forest must prevail.

Coming, therefore, to De Forest's case, the Examiner of Interferences found that in the experiment of August 6, 1912, the repeating circuit used as an amplifier of telephonic currents was modified by a connection between the plate filament circuit and the grid filament circuit. This resulted in the production of "a beautiful clear tone." "This," the witnesses have testified, "was due to the audion generating oscillations or alternating current due to the feed-back action and was understood by them at the time of the experiment. This, it is believed, establishes the fact that De Forest had a conception of the invention at that time, August 6, 1912, and that it was disclosed to others." The Board of Examiners in Chief, after reviewing the testimony, held that they were "not fully satisfied that De Forest really had a conception of his invention in August, 1912."

The Assistant Commissioner, reviewing the De Forest case, and the experiments made in August, 1912, held that:

"It must be conceded this circuit diagram of August 6, 1912, shows such an arrangement that, if the constants were proper, sustained alternating currents of oscillations would be produced. It is believed, further, the making of the diagram and the production of the 'beautiful clear tone' by the ap-

paratus connected up according to such diagram have been fairly proved by the evidence, and that, therefore, such apparatus embodied the issue of this interference. The authenticity of the notebooks and diagrams and the proofs as to their dates, as well as the production of the beautiful clear tone at the time alleged, have not been seriously controverted. Clearly the production of the tone was accidental, but this is not of moment. Did De Forest understand what was done, that the tone was due to the feed-back coupling relation, and could he reproduce the tone at will? De Forest states that he understood what was taking place, and both Logwood and Van Etten corroborate him; but he has introduced no record to support this oral testimony given many years afterwards."

He then holds that the failure of De Forest to proceed after August 6, 1912, with the feed-back circuit until after Armstrong had reduced to practice, entitled Armstrong to priority.

It will be observed that the Assistant Commissioner in effect holds that what De Forest did in August, 1912, amounted to a reduction to practice, but that after reducing the invention to practice he abandoned it. In patent law, abandonment after reduction to practice is a proposition somewhat difficult of demonstration. At best, however, abandonment under such circumstances is a matter of proof and not of assumption. We think De Forest's record will neither sustain the charge of abandonment nor lack of diligence. The Assistant Commissioner attempts to support his conclusion on the theory that, while De Forest unquestionably made this important discovery, he did not recognize how the effect was obtained, nor did he possess knowledge of how to reproduce it, and that such knowledge, accompanied by simultaneous or subsequent utilization of it in a manner essential to carry out its intended function, is necessary to take the production or discovery out of the class of abandoned experiments.

De Forest was the inventor of the epoch-marking invention, the audion, which he patented both as an amplifier and as a detector. Prior to 1912 he had devoted much of his time to experiments on the audion and to the various uses to which it might be put. At the time he discovered the oscillating audion he was investigating telegraphone recording, the telephone two-way repeater, and the amplifier for wireless work. It appears from his notebook records that the first discovery of the feed-back circuit for producing oscillations occurred in connection with his work on the amplifier for wireless and telephone two-way repeater work. There is some testimony, principally from memory, by De Forest and his corroborating witnesses, Van Etten and Logwood, that prior to August, 1912, the oscillating properties of the audion were discovered. It is unnecessary, however, to go behind the written records, of August 6, 1912. This record, with the accompanying drawing, which was made by Van Etten, who was working under the direction of De Forest, clearly shows a feed-back circuit. It also discloses that, when connected up, it produced oscillations evidenced by "a beautiful clear tone."

The notes and diagrams made by Van Etten on August 6, 1912, were not copied into the De Forest record book, but it was followed by more complete demonstrations on August 29, 1912, of which a full and complete record was made by Van Etten in the De Forest record book. The notes indicate that the circuit was tested for amplification with successful results. It is also noted that, reversing the connec-

tions to the secondary winding coil, all sorts of musical notes were produced in the Brandes phones, and that when the connections are reversed the musical notes, whistle, etc., disappear, and the ticks come through as before. There is no question, both from the disclosure and the testimony of the witnesses, that the circuit produced oscillations of audio frequencies, evidenced by the tones in the receiver, the pitch of which could be varied by small changes in the constants of the circuit. While some question is raised as to whether the oscillations were produced by coupling of the circuits of the audion or by means not covered by the issue, we think there can be no question, from the evidence supporting the disclosure, that the oscillations were produced by coupling of the audion circuits.

We think the drawings and notes made by Van Etten in August, 1912, clearly disclose the invention as well as the results obtained. The notes trace from the diagram the successful results culminating in the production of the alternating currents. This is not the character of invention where one skilled in the art can draw a diagram and from mere observation theorize a result. No one could even guess how the audion would act in the circuit. It contained an undisclosed secret, an undiscovered phenomena, which could only be revealed through an actual test. We think the notes contained a complete record of the invention in issue, as well as the results obtained. This marvelous invention was not such a thing as would likely be forgotten by those who witnessed its discovery. Nor does the testimony of the witnesses support either the conclusion that it was cast aside and forgotten, or that their understanding of it was too meager to permit of its reproduction.

Indeed, it is conceded, by the opposing parties, that the circuit arrangement, as shown in the record of August 6, 1912, is a feed-back circuit. It is further clearly shown that oscillations were produced, and that the oscillations were produced because of the feed-back circuit. Van Etten testified that the purpose was "to demonstrate that the audion would amplify minute currents and would be useful primarily in wireless work." He further testified that the experiment with the audion as an amplifier was deliberately made "with the expectation and intention of making the audion sing or produce various musical notes and alternating currents." He also testified that the work was done under the general direction of De Forest, and "that he was acquainted with the progress of the work." Speaking of the notebook record, Van Etten said:

"The write-up indicated that, in the course of an experiment with the audion as an amplifier, I deliberately turned aside to determine what might be done with the equipment and circuit then available, to produce musical tones and alternating currents."

De Forest testifies that in August, 1912:

"The first arrangement was used and disclosed for producing alternating currents suitable for the production of musical tone. The principles involved were discussed and explained, the circuits were clearly understood and recorded, and many observations were made covering the arrangements or changes whereby the pitch and quality of the musical notes thus produced could be controlled."

298 F.—64

It is generally conceded, indeed, as it must be, not only by the Examiner and Commissioner, but by the parties to this action, that the diagram made in August, 1912, as well as the accompanying notes, not only disclosed the invention, but disclosed it in a clear workable manner. So clearly was this fixed in the mind of De Forest that in October, 1912, he returned to New York and there met the witness Stone at the Arts Club. He told Stone of his discovery. Stone procured a piece of paper on which De Forest reproduced the drawing showing the invention, as it appeared in the disclosure made in August. So perfectly did this demonstrate the invention that Stone, years afterwards, when testifying in this case, took a piece of paper and reproduced the drawing while on the witness stand, purely from his recollection of what he had seen in the Arts Club in New York.

In February, 1913, De Forest returned to California, and on April 17th following put into actual practice the oscillating audion. In May of the same year he returned to New York, and in June filed an application for a patent for the amplifier and relay, in the hope of raising sufficient funds to commercialize the present invention. He succeeded in September, 1913, in selling to the telephone company the invention for which he filed in June, and immediately wired Logwood in California to join him for the purpose of commercializing the oscillating audion invention. Logwood came to New York, and in October started work towards commercializing the invention. March 12, 1914, application was filed by De Forest and Logwood for the oscillating audion invention, and about the same time apparatus was manufactured and sold embodying the invention.

The present application was filed by De Forest individually, September 23, 1915. The subject-matter here in issue was the sole invention of De Forest, but it was disclosed in the original joint application of De Forest and Logwood. The facts relative to the activity of De Forest following the discovery of August, 1912, are not only well proven, but they stand undisputed in this record, and we think completely negative any thought of abandonment. They likewise conclusively answer the charge of lack of diligence, if it be assumed that the disclosure of August, 1912, amounted to nothing more than a conception of the invention.

In this view of the case, it matters little whether the case be disposed of upon the theory that what was done in August, 1912, amounted to reduction to practice or merely conception of the invention. In either event De Forest must prevail. While we think the work then accomplished amounted to reduction to practice, the case can be as readily disposed of upon the ground that De Forest clearly had at that time a conception of the invention and made a disclosure of it to others, since there is nothing to show, under the circumstances disclosed in this record, that he was lacking in diligence.

Attention has been directed to our decision in the case of De Forest v. Miller, 50 App. D. C. 202, 269 Fed. 718, where it is urged that we passed upon the sufficiency of De Forest's disclosure of August 6, 1912. The issue in that case involved a system for producing musical sounds, whereby the pitch and intensity could be so controlled as to

produce any note of the musical scale at will, thereby obtaining a musical instrument which produced beautiful, clear, and sweet musical notes. The claim was very different from the claim here in issue, which calls for "means for producing sustained electrical oscillations." The development of the musical instrument did not occur until 1915, when the interference arose between the applications of De Forest and Miller. It was not denied by the Patent Office in that case that the disclosure of De Forest of August 6, 1912, amounted to a conception of the invention; but, assuming that to be true, it was properly held by the tribunals that there was a total lack of diligence on his part in developing the particular invention there in issue. Hence that case has no bearing upon the present litigation.

It is insisted, however, that the question of priority between De Forest and Armstrong was disposed of by the United States District Court for the Southern District of New York in Armstrong v. De Forest Radio Telephone & Telegraph Co., 279 Fed. 445. That case involved an infringement, and the question of priority, so far as the present interference is concerned, was not there involved. The Armstrong patent there in suit involved a radio signaling system, and every claim called for a radio signaling system, and in no respect contemplated the production of "sustained electrical oscillations." We are not here concerned with the question of whether the production of electrical oscillations be of radio or audio frequencies, or to what particular use they are put. So remote are the present issues from the claims before the New York court that, if De Forest had been accorded August 6, 1912, for reduction to practice in that case, it would not necessarily have anticipated the terms of the claims of the Armstrong patent. Hence the discussion of the New York court, as to what De Forest did in August, 1912, is merely persuasive.

The decisions of the Commissioner are reversed, and priority awarded De Forest.

This case was decided prior to the death of the late Chief Justice.