GENERAL TIRE AND RUBBER COM-PANY, Emert S. Pfau, Gilbert H. Swart, Kermit V. Weinstock, Plaintiffs,

v.

Robert C. WATSON, Commissioner of Patents, Defendant.

Civ. A. No. 1806-57.

United States District Court
District of Columbia.

June 9, 1960.

Edward B. Beale and Clyde V. Erwin, Washington, D. C., Frank J. Earnheart, Akron, Ohio, and Frank S. Greene and William C. McCoy, Cleveland, Ohio, for plaintiffs.

Joseph Schimmel, Asst. Sol., Patent Office, and Haywood Brown, Dept. of Justice, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is an action against the Commissioner of Patents under 35 U.S.C.

**346**

§ 145, to secure an adjudication that the plaintiffs are entitled to a patent on an application that had been rejected by him. The applicants for the patent are Emert S. Pfau, Gilbert W. Swart, and Kermit V. Weinstock. The application is numbered 196584 and was filed on November 20, 1950. It was assigned by mesne assignments to the corporate plaintiff, the General Tire and Rubber Company.

The invention lies in the field of synthetic rubber. The specific invention claimed is an article of manufacture. It is tough rubber to which a large amount of oil is added in the course of manufacture, with the result that the same amount of raw material produces a much larger amount of the finished product than theretofore, and also that the rubber so produced has superior qualities, especially for use as tire treads. It is known in the trade as "oil extended rubber". In their application for the patent, the inventors state:

"We have found that the tough rubbers which were considered unprocessible and not suitable for making extruded tire treads in production may be mixed with relatively large amounts of one or more compatible oils or plasticizers to provide compounds of exceptional quality."

■ The course of this application in the Patent Office was somewhat unusual and, therefore, it may be useful to make a brief reference to it. When it was originally filed, it was assigned to Division 45, which deals with tires, among other matters. The prosecution of the application ended with an allowance by the examiner on December 10, 1954. The applicants promptly paid their final fee. On December 28, 1954, however, another examiner assigned to Division 50, which, among other things, deals with synthetic rubber, requested that the application be withdrawn from issue for the purpose of rejecting claims in view of newly discovered references. Accordingly, the application was withdrawn from issue and transferred from Division 45 to Division

50, by the appropriate authorities of the Patent Office. The prosecution of the application was then resumed and ended in a rejection on the general ground that the claims were unpatentable over prior art and that whatever step was taken by the inventors was obvious in the light of the prior art. On appeal, this action of the examiner was affirmed by the Board of Appeals of the Patent Office. The significance of this history of the application in the Patent Office is that unlike the great majority of the cases from the Patent Office that come before this Court, there was no unanimity among the Patent Office tribunals but there was a difference of opinion as between two of the examiners and the action of one of them was ultimately affirmed by the Board of Appeals. Consequently, this matter does not come before this Court in a manner requiring the same weight to be attached to the action of Patent Office authorities as when they are all in accord.

The decision of the Board of Appeals of the Patent Office was followed by the institution of the present suit. The defenses of the Commissioner may, for the purposes of convenience, be divided into three categories. The first defense is based upon the record before the Patent Office, as is usually the fact in cases of this kind. Second, the Commissioner in this action advances and relies on an item of prior art, to wit, a British patent, which neither of the two examiners considered. Third, by an amendment to the answer filed on the very eve of trial, the defendant interposed the defense of prior use and prior knowledge, within the meaning of 35 U.S.C. § 102(a).

Before taking up these defenses, it seems helpful to place the plaintiffs' development in its appropriate setting. Synthetic rubber is a product of comparatively recent origin. The manufacture of synthetic rubber received a strong impetus and developed very rapidly after the Japanese attack on Pearl Harbor because the Japanese invasion of certain Far Eastern areas cut off the supply of natural rubber. Wartime conditions, on

the other hand, greatly increased the need for rubber. The requirements of national defense were so urgent and so great that the Government took an active interest in developing the synthetic rubber industry and a governmental agency for that purpose was established, known as the Rubber Reserve, under the aegis and control of the Reconstruction Finance Corporation. Among the very important requirements of rubber was its use for tire treads. Because of the stress and strain to which tires are subjected, a superior type of rubber was needed for that purpose.

At this point it might be observed that rubber comes in various degrees of toughness. A process and machinery was developed for measuring the toughness or softness of any particular sample of rubber. An arbitrary scale was devised by a scientist by the name of Mooney, who also designed a machine for the purpose of measuring the toughness. Accordingly, the machine and the scale were given the name of their inventor and the arbitrary units of toughness became known as Mooney units. A tough rubber was known as a high Mooney rubber, a soft rubber as a low Mooney rubber.

The very tough types of synthetic rubber were regarded as practically useless as they could not be subjected to processing. In the ordinary processing of synthetic rubber, it became customary to use oil in small quantities, although oil was regarded as an enemy of rubber and as causing a deterioration in its qualities.

We now reach the history of the appellants' invention. The three individual inventors were research chemists or chemical engineers employed in the laboratory of the corporate plaintiff, the General Tire and Rubber Company. Late in 1949, when the industry was searching for additional means to increase the supply of rubber, the three inventors conceived the project of using tough rubber, which had been regarded as useless, for inferior purposes such as rubber mats for automobiles. In order to make this rubber usable for these purposes, they began to mix it with large quantities of oil. They discovered accidentally that instead of merely making it possible to employ for inferior purposes rubber of a type that had been regarded as not usable at all, they were producing a high quality of rubber suitable for tire treads. They found that mixing oil in large quantities of over 20 parts of oil to 100 parts of rubber with very tough rubber, or high Mooney rubber as it was known in the trade, increased the amount of the final product. They not only made it usable, but they improved its quality and found that it was excellent for tire treads.

Thus we have a development that was discovered accidentally by research scientists who were working with an entirely different objective in mind than the one which they finally achieved. This was not an invention, in other words, laboriously derived through trial and error or attained by a long process of experimentation. It was one of those unusual situations where a discovery is made or an invention designed accidentally while the inventor or discoverer was in the throes of a somewhat different development.

The present statute emphasizes the proposition that it makes no difference as to patentability by what manner an invention is made. 35 U.S.C. § 103. The fact, however, that the discovery was made accidentally by a person skilled in the art, while others had been working to find other ways and means to achieve the same general objective, namely, to increase the supply of usable rubber, would seem, to some extent at least, to negative the contention that the invention was obvious. This circumstance, of course, is not conclusive, but it is one of the many matters that are worthy of consideration in that connection.

The invention came into common use and the type of rubber devised by the three applicants for the patent was accepted by the industry within a few years following their discovery. That the inventors made a valuable commercial con-

**348**

tribution to the industry was conceded by the examiner who finally disallowed the application. He rejected it, however, on the ground that in the light of the prior art the step taken by the applicants did not involve the use of the inventive faculty but would have been obvious to a person having ordinary skill in the art to which the subject matter of the invention pertains.

The prior art shows, and it is conceded by the plaintiffs, that the use of oil in the processing of rubber was well known at the time of the applicant's invention. It would prolong this opinion unduly to review each item of the prior art separately. This will be done in the findings of fact to be made by the Court. Suffice it to say that the prior art clearly indicates the use of oil in the processing of rubber for various purposes. However, oil was generally used in small quantities rather than large quantities as is done by the inventors here. Moreover, it was considered detrimental to the quality of the product and it was regarded that the more oil that was used in the course of the process the more the final product would deteriorate. The discovery made by the applicants is, in effect, that tough rubber is improved in quality if oil is used in its manufacture in large quantities, with the result that not only is the quantity of the final product greatly increased over the amount of the raw material that is used, but that a superior product is obtained.

■ The law, of course, does not grant patents on abstract ideas but only on concrete embodiments of an idea. Nevertheless, back of every patentable invention is an abstract idea, which may be called a discovery, and the invention becomes merely the concrete embodiment of the discovery. Therefore, one way of testing the existence of patentability is to analyze the nature of the discovery which forms the basis of the invention if discovery exists.

■ The Court is of the opinion that a discovery was made in this instance, as heretofore indicated, and that this dis-

covery was not obvious in the light of the prior art. As was pointed out by Judge Learned Hand in Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 18 F.2d 66, 68, if the inventor's structure or product involves a new and novel idea, a very slight structural change may be enough to support a patent. The principles discussed by Judge Hand were followed by this Court in Shell Development Co. v. Watson, D.C., 148 F.Supp. 373, 376.

The view of the Court that the step taken by the applicants was not obvious in the light of the prior art is supported by a number of considerations. Each of them alone may not be sufficient, but all taken together strongly sustain the inference reached by the Court. Other workers in the industry were groping for ways and means to increase the quality of rubber and augment the output in view of the wartime needs, which were very pressing. Yet, none of them hit upon the idea that was discovered, accidentally, by the applicants.

After the invention was completed, the plaintiff corporation offered it to the Reconstruction Finance Corporation, without, however, disclosing its details but merely revealing the object which it was claimed had been attained. The Reconstruction Finance Corporation was interested and wanted to ascertain of what the invention consisted. The file shows that the plaintiff declined to make any detailed disclosure but, instead, offered a formal contract to the Reconstruction Finance Corporation to sell to it the right to use the invention. The Reconstruction Finance Corporation expressed considerable displeasure and apparently resented, with some justification, the attitude of the plaintiff corporation in endeavoring to sell something without revealing what it was. The merits of that attitude, however, are not to be passed upon by this Court in this litigation because it is not in issue. The importance of this matter so far as this case is concerned lies in the fact that scientists of the Reconstruction Finance Corporation

immediately undertook research work to ascertain, independently, what the applicants had achieved, but were unable to do so. This, too, has some bearing upon the lack of obviousness of the invention.

Finally, we have the circumstance that this invention was accepted by the industry. To be sure, acceptance by the industry and commercial success is not conclusive proof of patentability, but in a close case it is entitled to considerable weight in that respect. All these circumstances taken together, coupled with the manner in which the invention was made, support the conclusion of the Court that the step taken by the inventors over the prior art was far from obvious but involved the use of the inventive faculty.

We now come to the second aspect of the defense, namely, a British patent to Jennings, dated April 9, 1947, numbered 586973. As heretofore stated, this patent was not cited or considered by either of the two examiners who acted on this application, although, manifestly, it was available to each of them.

Before considering the British patent, it is necessary to be reminded of the rule, as stated by the Court of Appeals for this Circuit in Davies v. Coe, 65 App.D.C. 345, 346, 83 F.2d 602, 603, that:

"The disclosure of a foreign patent is to be measured not by what may be made out of it, but what is clearly and definitely expressed in it."

The same principle was enunciated in the case of In re Ek, 57 App.D.C. 203, 204, 19 F.2d 677, and in Switzer v. Marzall, D.C., 96 F.Supp. 332, 333.

The patent to Jennings does, in fact, as claimed by counsel for the Commissioner of Patents, disclose the use of oil in the manufacture of synthetic rubber. The patent does not state in so many words that it is directed to the manufacture of tough rubber, as does the invention made by the applicants, but counsel for the Commissioner argues that the type of rubber referred to in the patent is a tough form of rubber. However, the Jennings patent does not show what the Mooney value and how tough the rubber in question is or should be. It does not indicate that a superior kind of rubber is derived by the use of large quantities of oil or that the process may be used for the purpose of augmenting the quantity of the output as well as its quality.

There is no doubt that the Jennings patent discloses in a general way the use of oil in the manufacture of synthetic rubber, but it cannot be said to point directly to the invention involved in this case and, therefore, cannot be deemed to be an anticipation. It must be emphasized that the Jennings patent does not refer to tough rubber as being one of the vital elements of the invention. It does not indicate any definite degree of toughness of the rubber to be used, nor is it limited to large quantities of oil. Moreover it does not show any advantages to be derived from the use of a large quantity of oil.

Finally, we have the defense introduced at the last moment, on the eve of trial, of prior use of the invention. Associate counsel for the defendant offered evidence that in November 1942 a concern then known as the Wilmington Chemical Company, of Wilmington, Delaware, requested the Dewey & Almy Division of W. R. Grace & Company, to produce at its plant in Cambridge, Massachusetts, extremely tough specimens of rubber; that representatives of the Wilmington Chemical Company then proceeded to the Cambridge plant, having first prepared an emulsion consisting of 60 per cent of oil. At the Cambridge plant, according to the testimony, representatives of the Wilmington Chemical Company mixed the rubber previously produced pursuant to their order with the emulsion that they, themselves, had made, combining it to the extent of 25 parts of the emulsion to 100 parts of rubber. They further testified that samples of the rubber that they produced were sent to the War Pro-

duction Board and that the entire quantity so made amounted to two or three hundred pounds. They testified further that in a similar manner they made a second batch in January 1943.

It is important to observe that they admitted that they were not present when the constituent parts of the rubber were manufacured at the Cambridge plant, and no one who participated in the manufacturing process was produced as a witness. There was no definite and conclusive showing as to the Mooney value, so-called, of the rubber with which the emulsion was mixed.

Moreover, the Vice President in Charge of Sales of the Wilmington Chemical Company, who testified in support of this defense, admitted on cross-examination that at a later time he worked for the plaintiff corporation and, helped to prepare literature in which it was claimed by the plaintiff corporation that its oil-extended rubber was a novelty. Obviously, this affects the credibility of his testimony.

■ It is well settled that a prior unpatented development or a prior use not described in a printed publication, in order to anticipate a patent, must be proven by clear and convincing evidence and not by the ordinary preponderance of evidence. In fact, there are expressions in some of the cases that it must be proven beyond a reasonable doubt. It is not, however, necessary to go as far as that in this case. Among the many cases establishing the degree of proof required to sustain such a defense of prior use and prior knowledge are United Parts Manufacturing Co. v. Lee Motor Products, Inc., 6 Cir., 266 F.2d 20, 24, and Schering Corp. v. Marzall, D.C., 101 F. Supp. 571, 573. In Radio Corporation of America v. Radio Engineering Laboratories, 293 U.S. 1, 7, 55 S.Ct. 928, 79 L. Ed. 163, the Supreme Court went as far as to say that the burden of proof to make good this defense is upon the party setting it up and every reasonable doubt should be resolved against him. The Court further stated that the defense of invention by another must be established by the clearest proof, perhaps beyond a reasonable doubt.

There is a sound basis for this strict rule. The fallibility and fraility of human memory are such that it is very easy to make an honest mistake in testifying to the details of some events that are claimed to have occurred many years previously,—in this instance, 18 years ago. Patent rights should not be disposed of on such a nebulous basis.

Accordingly, the Court is of the opinion that the defense of prior knowledge and prior use has not been established.

There is one other matter to which the Court deems it necessary to refer. Defendant's counsel call attention to a decision of the Court of Customs and Patent Appeals in the Application of Schulze, 244 F.2d 320, 44 CCPA 928. In that case, the Court sustained a decision of the Board of Appeals of the Patent Office, which had rejected claims on a process for the manufacture of synthetic rubber, the process being the same as that used by the applicants in this case.

■ The decisions of the Court of Customs and Patent Appeals, are, of course, neither binding nor controlling on this Court, as are the decisions of the Court of Appeals for the District of Columbia Circuit. Watson v. Allen, 103 U.S.App.D.C. 5, 254 F.2d 342, 347. Nevertheless, decisions of that Court should receive great weight and be treated with great respect. Accordingly, this Court has examined with care the opinion to which reference has been made and has also scrutinized in detail the record on appeal before the Court of Customs and Patent Appeals. The Court has reached the conclusion that the case is distinguishable. First, the claims involved in the Schulze case were, as heretofore stated, claims for a process. All of the claims in the case at bar are claims on a product. Manifestly, it does not

necessarily follow, because a process by which a product is manufactured is not patentable, that, therefore, the product itself is not patentable. It seems to this Court entirely reasonable to hold that the process used by the applicants in this case had no element of novelty. That does not detract from the conclusion that they achieved a novel product of a patentable character. The manufacture of a new product does not necessarily depend upon the novelty of the process. It may result from an appropriate and new selection of the ingredients and their composition.

Secondly, it is necessary to observe that a great deal of testimony was introduced in this case supporting the conclusion that the invention was not obvious. Most of this testimony was not before the Patent Office in this case, nor was it before the Court of Customs and Patent Appeals in the Schulze case. It may well be that if the voluminous testimony of the very cogent character that was introduced in behalf of the plaintiff in this action had been before the Court of Customs and Patent Appeals in the Schulze case, a different decision might well have been reached by it.

Similarly, if all of this material had been available to the Patent Office, the Patent Office, it is entirely conceivable, might also have reached a different result. It is perhaps unfortunate that, unlike the method of reviewing decisions of some other administrative agencies, this Court is powerless to remand the case to the administrative agency for review in the light of new evidence.

In view of the considerations just summarized, the Court will render judgment in favor of the plaintiff, holding that the plaintiff corporation is entitled to a patent on all of the claims involved in this action, except Claim 51, which has been withdrawn by the plaintiff from consideration by the Court.

Counsel will submit proposed findings of fact and conclusions of law and a proposed judgment.