31 C.C.P.A.(Patents)

SPERRY v. PAYNE (two cases).

SAME v. TESCHNER.

Nos. 4776–4778.

Court of Customs and Patent Appeals.

Feb. 7, 1944.

Rehearing Denied April 3, 1944.

Zabel, Carlson, Gritzbaugh & Wells, of Chicago, Ill. (Max W. Zabel, Greek Wells, and Foster York, all of Chicago, Ill., of counsel), for appellant.

Brown, Jackson, Boettcher & Dienner, of Chicago, Ill. (Arthur H. Boettcher, of Chicago, Ill., of counsel), for appellees.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

These are appeals from decisions of the Board of Appeals of the United States Patent Office affirming those of the Examiner of Interferences awarding priority of invention of the subject matter of the counts in Appeals Nos. 4776 and 4777 to Payne, the senior party, and in Appeal No. 4778 to Teschner, the junior party.

All the appeals relate generally to the same subject matter. The attorneys for appellant and appellee in each case are the same and the appeals were argued together. For the reason that the interferences are so closely related they will be disposed of in a single opinion, but each will be separately discussed and decided.

The involved subject matter is an automobile heater comprising a radiator core and a fan and blower unit adapted to project two streams of heated air in different directions; in other words, one stream may be directed to one place in the car and another, to another. For example, one

stream may be used to defrost the windshield while the other is heating the car.

The interferences all involve an application of the appellant, Serial No. 132,000, filed March 20, 1937. Appeals Nos. 4776 and 4777 involve an application of appellee Payne, Serial No. 128,077, filed February 27, 1937. Appeal No. 4778 involves the application of the appellee Teschner, Serial No. 137,083, filed April 15, 1937.

### Appeal No. 4776—Interference No. 75,056.

In this interference no testimony was taken on behalf of appellee and he is restricted to the filing date of his application, February 27, 1937, for conception and constructive reduction to practice. He offered in evidence a copy of the printed "Record for Sperry" in Interference No. 73,751. That interference involved related subject matter, among other parties including the party Sperry. The Examiner of Interferences would not consider that record since it was not introduced in accordance with rule 157 of the Rules of Practice, 35 U.S.C.A.Appendix, citing Olson v. Pospeshil, 50 App.D.C. 182, 269 F. 698. We are in full agreement with that decision of the examiner.

Testimony was taken on behalf of the appellant and many physical exhibits supporting the testimony were received in evidence.

The single count herein reads as follows:

"In combination, a heat exchange device comprising a housing, a radiator core disposed within said housing, and means for circulating air through the radiator core, said means comprising an outer fan driving air into said core and an inner fan withdrawing air from said core."

The interference as declared involved three parties. The third party did not appeal from the decision of the Examiner of Interferences.

In his preliminary statement appellant alleged a conception of the invention and a disclosure of it to others on or about January 10, 1936. He also alleged that shortly after that date he embodied the invention in a device having all the necessary elements to prove a reduction of the invention to practice and that he afterward embodied his invention in a complete commercial machine on or about May 4, 1936.

Sperry Exhibit 1 comprises a motor with a shaft extending therethrough, at one end of which is fastened a four-bladed propulsion fan, the blades measuring about three inches from the shaft to the outer ends thereof. In appearance the fan is similar to the ordinary small air-circulating fan. Near the inner ends of the blades holes were bored therein. Between the fan and the motor, and also fastened to the shaft, is a cylindrical bakelite suction blower.

According to the record, the purpose of that device was to test out a theory of appellant that when the shaft was rotated by the motor air would be delivered in two directions, outwardly by the propeller fan and inwardly by the blower, the air drawn by the latter coming through the center portion of the fan and the holes in the blades. It appears that the device was mounted on a block with an automobile heating core in front of the fan and a metal band in the form of an oval housing or shroud surrounding the blower. In a test of the device smoke was generated in front of the heating core and it was observed that the smoke was drawn through the core by the blower in a direction opposite to the air driven by the fan. The record does not show any further test of that exhibit.

The Examiner of Interferences stated with respect to Exhibit 1 that the testimony of appellant concerning its building and testing was reasonably corroborated by two other witnesses, but that such testing was not more specifically fixed than "perhaps the 'fall of 1935.'" He held that Exhibit 1 could not be considered as establishing a conception of the complete operative device defined by the count.

Exhibit 2 comprises a blower fan assembly generally similar to Exhibit 1. It contains a metal blower comprising an annular shell having vanes in its periphery for removing air from the interior of the shell and surrounded by a brass housing or shroud through which air drawn by the blower is propelled in a direction different from that driven by the propulsion fan. That fan consists of six blades attached to the outer rim of the blower. The fan and blower assembly is attached by means of a shaft to a motor, which is fastened to the wall of the shroud by two U-shaped metal brackets. The testimony of appellant is that Exhibit 2 was completed about October 10 to 15, 1935, which date the Examiner of Interferences stated was amply corroborated by the witness who made the blower housing and assembled the device, and another witness who attached the fan blades to the blower.

Exhibit 2 was tested with a conventional heater apparently complete in all respects except that the core was not surrounded by a housing. The Examiner of Interferences held that Exhibit 2 was so tested probably immediately after the completion of the exhibit, sometime during the latter half of October 1935. The heating core which was used in that test is said to be the same as that now found in Exhibit 3, which is a conventional automobile heater the core of which is disposed within a housing. Fastened concentrically to the inner wall of the core is a metal ring in front of the fan and providing a channel around the inlet from the core to the blower. The ring is about the same diameter as that of the blower. However, the back plate which was used in the test was larger than that now on Exhibit 3, and the large U-bracket by means of which the heater is attachable to the body of an automobile was not on the heater at the time of the test. The test was made in the laboratory of appellant's company and the device was found to have a large blower outlet of air which did not interfere with the volume of air discharged by the propulsion or propeller fan. The assembled device was tested in the following manner, according to appellant:

"* * * The air was tested for its velocity and compared with the ordinary type heaters that we were making with a plain propeller-type fan, and we found that we did not lessen the frontal air but very little, but at the same time the air that was drawn through the core to feed the blower was of a sufficient volume that enabled us to use it for the purpose that the device was intended for."

One of his corroborating witnesses testified as follows:

"When that core was placed onto the plate, there were two pipes projecting from each end of the core which were connected to a hot water supply system that was heated with gas. The hot water pumped through the core, heated the core to a high temperature."

And also:

"We found out that the temperature of the air was about the same as we would get with an ordinary fan behind a core of about that size, and that the velocity was pretty close to the reading of an ordinary fan. The temperature of the foot-warmer was much higher than ordinary room temperature."

The record clearly shows that the device operated in a satisfactory manner to demonstrate that by means of the heating core and fan assembly heated air could be blown in different directions.

For the reason that that assembly did not include a housing on the latter as required by the count, the examiner held it could not serve as a conception of the invention of the count.

Exhibit 4 is a motor, fan and blower assembly in all respects similar to Exhibit 2 except that the diameter of the blower is very little larger. According to the testimony of appellant the blower was so constructed for the purpose of comparing the air volume drawn by it with that of Exhibit 2. Exhibit 5 is a conventional heater similar to Exhibit 3.

The appellant testified that Exhibit 5 was a heating core and housing of standard construction made by his company, and that when assembled with Exhibit 4 it was tested by connecting the motor with electric current which drove the blower and propeller fan, causing air to be propelled forward through the front of the heater and drawn by the blower in rearward direction through the center of the core through the outlet in the blower housing. He stated that from the test he ascertained that the speed of the motor in connection with the design of the fan blades and blower assembly controlled to some degree the amount of air delivery from both blower and fan, and with this information he proceeded to lay out what was to be the production type of the device. With respect to the temperature of the core at the time the test was made he said he believed that hot water was used throughout the test for the reason that water tubes extended from the water tanks to the core. He testified that Exhibits 4 and 5 were made within two weeks after the making of Exhibit 2 and its testing with the core of Exhibit 3, which latter two exhibits the examiner stated probably were assembled and tested sometime during the latter half of October 1935.

One of the corroborating witnesses testified that the assembled Exhibits 4 and 5 were tested by connecting the core to the hot-water supply and electric current, and that the streams of air were tested for velocity and temperature, both in front of the heater and at the blower opening. This witness stated that the blower of Exhibit 4, although larger in diameter than that of

Exhibit 2, showed no material increase in efficiency, and in the test Exhibits 4 and 5 operated "Satisfactorily, the same as Exhibit 2."

The examiner held that even though the date of the assembling and testing of Exhibits 4 and 5, testified by appellant to have been sometime in November 1935, was not inconsistent with the dates given by the corroborating witness (the latter part of November 1935), such dates were not definitely established and therefore were inconclusive as to fixing the date of construction and satisfactory operation and reduction of the device to practice. He pointed out it was "unusual" for appellant to be at all uncertain as to when those exhibits were assembled as a complete unit when such assembly was a necessary part of the testing. He further pointed out that when appellant was asked whether the assembly of Exhibits 4 and 5 was made prior to the beginning of the hearing, he answered "I believe they were assembled as a complete unit at one time or another." The examiner was of opinion that appellant based his statement that he believed hot water was passed through the core during the test largely on the appearance of the water tubes of Exhibit 5 at the time testimony was taken. In summary, with respect to those two exhibits, the examiner held that, granting that their assembly not later than November 1935 was properly "verified," it could serve as nothing more than a conception of the device of the interference count as of the date alleged in the preliminary statement since the testimony with respect to the testing thereof was insufficient to serve as proof of reduction to practice.

Exhibit 6 is a third fan and blower assembly designed by appellant and made under his supervision. It appears to be the same as Exhibit 2 except that there are five propeller fan blades instead of six. The record shows it was incorporated in a regular production one-hole mounting heater made for automobiles by appellant's company and was installed in his automobile January 4, 1936.

The workers in appellant's company who made Exhibit 6 testified that after it was completed it was taken to the laboratory and tested with a stock heater, and proved to be "very satisfactory to the extent of its velocity of air, temperature of air at the front, and the foot-warmer opening at the blower."

Three other witnesses testified concerning the installation of the heater in the car at or about the time stated by appellant. The witness who took the heater to the garage where it was installed testified that he had received it from appellant. This witness definitely stated that it was a one-hole mounting heater and when asked to examine the exhibits heretofore mentioned to see whether or not he had anything to do with them during the "Fall of 1935 and 1936" stated he thought "this blower, Exhibit 6, was attached to a heater, that was installed on Mr. Sperry's car." The witness later stated he did not remember what kind of a fan was on the heater, but was positive that Exhibit 6 was incorporated therein. The examiner observed that the question as to what kind of a fan was on the heater was possibly ambiguous because it referred to a fan rather than a blower, and if that were the explanation for the apparently inconsistent answer that there was a blower on the heater it had not been brought out by the testimony. Therefore the examiner held that although the witness' testimony had not been contradicted or shaken by cross-examination it was somewhat weakened by failure to clarify what the examiner deemed to be inconsistent answers.

The one-hole mounting heater is shown by a catalog, which is in evidence, circulated by appellant's company, to be a conventional automobile heater, the one-hole feature meaning that only one hole was necessary in the body of the car through which to fasten the heater. This, like all conventional heaters, was equipped with a housing around the radiator core.

The record shows that after this last-named heater containing Exhibit 6 was installed, the car was driven to appellant's plant and was tested as "is always done after installation to see that the heater works." It was testified that "When we have installed a heater in a car, we run the motor for a certain length of time to heat up the water, and then turn the heater on to see if we get heat through the core," and that this was done with respect to the heater that was installed in appellant's car. The witness was positive this was done because as he said it was done to all heaters installed by the company. Under cross-examination the witness was positive that the heater installed in appellant's car differed in appearance from the stock one-hole mounting heaters in that Exhibit 6 was

attached to it. The heater to which Exhibit 6 was attached is not in evidence, the record showing that it was lost.

The examiner held that, even though the testimony was sufficient to establish the installation of Exhibit 6 in appellant's automobile, it was deficient to establish a successful operation and testing of the device, and therefore did not demonstrate an actual reduction to practice.

A fan and blower assembly, Exhibit 8, identical in all material respects with Exhibits 2, 4 and 6, was made and used in the production of dies and tools for the commercial device of appellant's company, which was afterward put on the market. That exhibit was completed about the middle of June 1936, but there is nothing in the record to show that it was assembled into a heater core.

Exhibit 2 and Exhibit 3 were assembled and tested in the laboratory of appellant's company after the assembly was made. Appellant and one corroborating witness testified the assembly was made in July 1936, while another witness stated it was made sometime in November of that year. The test to which the assembly was subjected was as follows: "It was mounted on a board, connected to the hot water supply system, the electrical connections made, tested for amount of heat, air velocity, from in front of the heater and also the foot-warmer." When the witness was asked how it worked, he answered "Satisfactorily."

The examiner held the difference in dates (July and November 1936) to be of no great importance for the reason that in his view there was no testimony relative to the operation and testing of the assembly and accordingly it could not serve as proof of a reduction to practice of the subject matter of the count even if its assembled date had been properly verified.

The examiner finally held that the entire record of appellant lacked sufficient evidence to show adequate testing to prove actual reduction to practice of the invention defined by the count in issue prior to his filing date. He was of opinion that the assembly of Exhibits 4 and 6 with Exhibit 5 and the heater not in evidence, respectively, embodied the elements of the involved invention and constituted a conception thereof as of January 10, 1936, as alleged in appellant's preliminary statement, and accordingly awarded that date to appellant. However, he restricted appellant to his filing date, March 20, 1937, for constructive reduction to practice and held that appellant had not been diligent during the critical period. Therefore he awarded priority of invention of the subject matter of the count to appellee.

The Board of Appeals in its decision affirmed the holding of the examiner that the record of appellant was insufficient to show adequate testing of the device to establish actual reduction to practice. In its decision it is said that appellant contended before it that the examiner erred in failing to give any weight to the tests of the devices which were the same as that of the count except that they lacked a housing over the core, and that under the doctrine of Stewart v. Thomas, 42 App.D.C. 222, those tests were sufficient to establish a reduction to practice. In commenting on that case the board stated:

"* * * The doctrine of this decision was that if the device tested did not contain all the elements included in the issue but did contain all of the elements of the real invention and did what it was expected to do, it constituted a reduction to practice. It seems rather obvious that the housing for the radiator core is essential to complete the structure of the operative device since the effective control of the air through the radiator core and the shutters 6, 7, 8 and 9 depends on such a housing."

The tribunals below held that the exhibits of appellant were made and assembled at or about the time testified to by him. The only issue here is whether or not the exhibits were adequately tested so as to properly establish reduction to practice.

Appellant at the time of taking testimony was the General Manager of the Excel Auto Radiator Company, the plant of which is in the city of Chicago, and it was part of his duties to develop automobile heating devices. The company was the maker of "Hot Water Auto Heaters" and "Defrosting Fans and Thermostats for Automobiles." Therefore it must be presumed that appellant was skilled in the automobile heating art, and that the heaters produced by his company functioned for their designed purpose.

In the year 1936 and prior thereto hot water automobile heaters were common as accessories for automobiles. They comprised, generally speaking, a heating or radiator core disposed within a housing and propulsion fan means for circulating heated air into the interior of the automobile in

one direction through the radiator core. The air became heated by reason of passing over the heater or radiator core, which was kept at an elevated temperature by means of circulating hot water. Not only was such a heat exchange device old, but also the blower or suction-type fan, during the times herein mentioned.

From the record it is clear that appellant was the first to discover the use of a blower and a propulsion fan operating together in close juxtaposition on a single shaft in connection with a heat exchange device for heating the interior of an automobile body.

Appellant had a theory that the air in front of a propulsion fan had little or no motion at the center thereof and therefore a fan and blower could be made to work in a single assembly, with an automobile heater whereby currents of air would be discharged in opposite directions to heat automobile bodies, and Exhibit 1 was made in accordance with that theory. The test of the exhibit with smoke demonstrated that his theory was correct.

After that test he built Exhibit 2. It was attached to an ordinary heater core heated by means of circulating hot water therethrough, and the motor thereof was connected with electric current. When the fan assembly was activated heated air was propelled through the face of the core by the propulsion fan at a temperature about the same as that which would be secured in the conventional hot water automobile heater with a heating core of the same size and in velocity about as high, and the temperature of the air drawn through the blower was much higher than ordinary room temperature. The only limitation contained in the count not present in the device so tested is that in such test device the radiator core was not disposed within a housing.

For the reason that the housing required by the count was not a part of the test mentioned in the preceding paragraph such test of itself cannot be held to be a reduction to practice of the device defined in the count, Wilcox v. Danner et al., 53 F. 2d 711, 19 C.C.P.A., Patents, 802, and cases cited therein, but we are of opinion for reasons hereinafter appearing that we should not ignore the result of such test in view of the other exhibits and testimony concerning them.

The only reason why Exhibit 4 was made appears to be that appellant thought that if the diameter of the blower were a trifle larger the volume of air therethrough would be greater. Accordingly Exhibit 4 was assembled with Exhibit 5, which was a standard conventional heating radiator the core of which was enclosed within a conventional housing. That assembly was tested in the same manner as the tests performed on Exhibit 2 and the heating core within the housing, and it was noted that the increased diameter of Exhibit 4 made very little difference. One of the witnesses who was present at or made both of those tests testified that the assembly of Exhibits 4 and 5 worked "Satisfactorily, the same as Exhibit 2." No reasonable conclusion can be drawn from the testimony concerning the test of Exhibits 4 and 5 other than that the test for temperature and air velocity shown in the latter was as satisfactory as that which had been shown in the test of Exhibit 2 and the said core.

It will be noted from the quoted portion of the board's decision that it was of the opinion that the housing was essential to complete the operative device because effective heat control through the radiator core and the shutters depended upon such a housing. The board evidently based that part of its decision upon the testimony of one of appellant's witnesses to which it referred, who stated that the casing had a tendency "to hold the air in its line of course and will not separate until leaving the core * * *." While it is true that that witness thought that the casing or housing had a useful function in the mechanism, it will be readily observed that such function or use by the housing was merely to effect more of a concentration and control of currents of heated air coming through the face of the core than if no housing had been present. Surely, if the temperature of the current of air coming from the fan in the test of Exhibit 2 with the heater unit complete except for the housing was the same as that which came from the conventional hot water automobile heater, and if the temperature of air from the blower in that test was higher than ordinary room temperature, all that can be said concerning the difference between that test and the test of assembled Exhibits 4 and 5 is that heated air coming through a heating core enclosed in a housing is better held in its line of course and will not separate until leaving the core, and must have been even better than that which the testimony shows was amply sufficient in the test of assembled Exhibit 2 and the heater core

without the housing. The record shows that in the test made of Exhibits 4 and 5 the assembly operated "Satisfactorily, the same as Exhibit 2."

Exhibit 6 in our opinion is clearly shown to have been present in the one-hole heater mounting at the time the latter was installed and tested in appellant's automobile, January 4, 1936. We see no necessity for any explanation of what the examiner thought to have been the inconsistent answers hereinbefore mentioned for the reason that the witness who testified concerning the presence of Exhibit 6 in the heater clearly drew a distinction between the meaning of the words "fan" and "blower". In our opinion the testimony concerning the testing of Exhibit 6, embodied in the stock heater which was installed in appellant's car, was amply sufficient to establish a reduction to practice of the device defined by the counts. It will be remembered the record shows that in this, as in all installations in a car, the motor was run sufficiently long to heat up the water and then the heater was turned on to see if it would function properly.

There can be no question but that Exhibits 2 and 3 were assembled sometime in the year 1936 and we are of opinion that since the test made of that assembly was exactly the same as that formerly made with the assembly of Exhibit 2 and the core without the housing and found to be satisfactory, the latter test should likewise be considered a reduction to practice when it was testified that the device worked "Satisfactorily, the same as Exhibit 2."

■ Appellee contends that the dates established and apparently held by the tribunals below with respect to the construction, assembly and testing of appellant's exhibits have not been established at all in legal effect. It is true that there were some minor inconsistencies between the witnesses as to actual dates, but nevertheless viewing such inconsistencies in the light most favorable to appellee we are of opinion that their testimony comes well within the proper limits of corroboration. It may be observed that much of the testimony in which dates were mentioned was based on the dates appearing on the actual devices. For instance, Exhibits 2, 4 and 6 comprise motors bearing the legend "Model E 36." This indicated to the witnesses that the motors were made between the Fall of 1935 and the Fall of 1936. It appears from the record that motors, like models of automobiles, are dated from the Fall of one year to the Fall of the next. Since it is apparent that the motors on those exhibits were made in the early Fall of 1935 or until the Fall of 1936, and it further appears that the fan assemblies were attached to said motors during the time when they were for current sale, and tests made shortly thereafter, we think there can be no question but that the construction, assembly and testing of the exhibits were made sometime at least during the year 1936, which is prior to appellee's filing date.

For the reasons hereinbefore set out the decision of the Board of Appeals in Appeal No. 4776, Interference No. 75,056, will be reversed.

### Appeal No. 4777—Interference No. 75,057.

The same applications are involved here as in Appeal No. 4776, and appellant here relies on the same record as that made in that interference.

It appears that the present interference was not included in Interference No. 75,056, Appeal No. 4776, for the reason that originally the parties were not the same, there having been additional contestants.

Here, as in Appeal No. 4776, appellee relies for conception and constructive reduction to practice on his filing date, February 27, 1937, which makes him the senior party, appellant's filing date being March 20, 1937.

Appellee introduced in evidence as his Exhibit 1 a copy of the printed "Record for Sperry" in Interference No. 73,751. That interference involved related subject matter and included the party Sperry. The Examiner of Interferences would not consider that record since it was not introduced in accordance with rule 157 of the Rules of Practice, citing Olson v. Pospeshil, 50 App.D.C. 182, 269 F. 698. We are in full agreement with that decision of the examiner.

There are two counts involved, which read as follows:

"1. In combination, a heat exchange device comprising a housing, a radiator core disposed within said housing, and means for circulating air through the radiator core, said means comprising an outer fan driving air into said core and an inner fan withdrawing air from said core, and a ring on said core adjacent the fans and providing a *barries* around the inlet from the core to the inner fan.

"2. In combination, a heat exchange device comprising a housing, a radiator core disposed within said housing, and means for circulating air through the radiator core, said means comprising an outer fan driving air into said core and an inner fan withdrawing air from said core, said inner fan comprising an annular shell having vanes in its periphery for removing air from the interior of the shell and having an axial opening toward the core, and said outer fan comprising fan blades mounted on said shell outwardly of said axial opening."

It will be observed that count 1 in this interference corresponds to the count in Appeal No. 4776 with the added limitation of a ring on the core adjacent the fans and providing a barrier around the inlet from the core to the inner fan.

Count 2 also responds to the count in the former interference except for the limitations on the design of the blower and fan.

The counts of the present interference are thus more restricted than the count in Appeal No. 4776.

The Examiner of Interferences here stated that in the former interference the evidence of appellant was held "inadequate to establish an actual reduction to practice of the count in issue primarily because of lack of evidence showing adequate testing" and accordingly held that the same evidence relied on by appellant in this interference must also fail to establish actual reduction to practice of the subject matter of the present counts.

The examiner found here that assembled Exhibits 4 and 5 and assembled Exhibits 2 and 3 each had a ring on the core as required by count 1. For a description of those exhibits reference is made to our decision in Appeal No. 4776.

The examiner held that Exhibits 4 and 5 were evidently completed and assembled sometime during the latter part of November 1935 and that the assembly included all the limitations in counts 1 and 2 and was considered adequate evidence of conception of the involved invention as of January 10, 1936, the date alleged in appellant's preliminary statement.

The examiner also held that Exhibit 6 with its associated core is a complete assembly of the invention described in count 2 and conception as to that count was therefore further accorded appellant on the

basis of that exhibit as well as Exhibits 4 and 5, of the date January 10, 1936.

An examination of all the exhibits discloses that all of the limitations of the involved counts have been met in appellant's structure.

The examiner refused to award appellant priority of invention in this interference for the same reason given for his decision in the former interference; namely, lack of evidence of adequate testing.

The board affirmed the decision of the examiner.

In view of our decision in Appeal No. 4776 in which we decided that appellant with respect to the assembly of Exhibits 4 and 5 and Exhibit 6 together with its associated heating core had actually reduced the invention to practice prior to the filing date of appellee, we find here that the evidence with respect to the assembly and testing of Exhibits 4 and 5 and Exhibit 6 together with its associated heating core proved an actual reduction to practice of the invention defined in the involved counts prior to the earliest available date of appellee, and for that reason the decision in Appeal No. 4777, Interference No. 75,-057, will be reversed.

Appeal No. 4778—Interference No. 75,058.

In this appeal appellant is the senior party, having filed his application on March 20, 1937, it being the same application as that involved in the companion interferences, and appellee filed his application April 15, 1937. The same record for appellant is relied on here as in the companion appeals. Appellee also took testimony.

There are three counts involved, which read as follows:

"1. In an automobile body heater, a substantially vertical forwardly facing radiator, a unitary fan member rotatably mounted about a substantially horizontal axis in back of said radiator, said unitary fan member including a centrifugal fan having a substantially circular extension thereon forming the centrifugal fan inlet, said unitary fan member also including blade members on said extending portion and extending radially outwardly beyond the outer periphery of said centrifugal fan, said blade members being positioned forwardly of said centrifugal fan, and a motor for driving said unitary fan member.

"2. In an automobile body heater assembly, in combination, a radiator, an axial flow type of fan in back of said radiator for forcing air forwardly through said radiator, a centrifugal type of fan in back of said axial flow type of fan, means forming a conduit between said radiator and centrifugal fan passing centrally through said axial flow type of fan, and means for driving said fans.

"3. As an article of manufacture, a fan unit comprising a substantially cylindrical portion having one of its ends substantially closed, longitudinally extending slots having vanes associated therewith in said cylindrical portion forming a centrifugal fan, said slots terminating short of the other end of said cylindrical member to provide an extension beyond said slots forming an inlet duct for said centrifugal fan, and outwardly directed blade members secured to said last named portion forming a propeller fan."

The Examiner of Interferences awarded January 30, 1937, to appellee as the date for his actual reduction of the invention to practice, which date is prior to appellant's filing date. We agree with that award. He held that the tests of appellant failed to show an adequate reduction to practice of the blower and fan assembly as defined by the counts prior to the date awarded appellee. While he made no mention of the structure of appellant's exhibits he seemingly conceded that the structural limitations of the counts were met by appellant's exhibits. An examination of such exhibits discloses that all of the limitations of the involved counts have been met in appellant's structure.

The Board of Appeals, one member thereof dissenting, affirmed the decision of the Examiner of Interferences. In its decision the board considered that count 3 found no support in any of appellant's exhibits in that the longitudinally extending slots in the blower did not terminate short of the end of the centrifugal fan (blower) to provide an extension beyond the slots to form an inlet duct for said centrifugal fan. As heretofore noted, we are convinced that appellant's exhibits meet every structural limitation in the involved counts.

In our decision in the companion Appeal No. 4776 we held that the appellant had actually reduced his invention to practice during the year 1936 and since this is prior to the date of reduction to practice, January 30, 1937, awarded by the tribunals of the Patent Office to appellee herein, it follows that the appellant should be awarded priority of invention in this appeal.

Accordingly the decision of the Board of Appeals in Appeal No. 4778, Interference No. 75,058, will be reversed.

The decisions of the Board of Appeals in Appeals No. 4776, No. 4777 and No. 4778 are reversed.

Reversed.