## EXCEL AUTO RADIATOR CO. v. BISHOP & BABCOCK MFG. CO.

### No. 10548.

Circuit Court of Appeals, Sixth Circuit.

May 3, 1948.

As Amended on Denial of Rehearing June 2, 1948.

Foster York, of Chicago, Ill. (Max W. Zabel, Foster York, and Edward U. Dithmar, all of Chicago, Ill., and Truman A. Herron, of Cincinatti, Ohio, on the brief), for appellant.

Arthur H. Boettcher, of Chicago, Ill. (Arthur H. Boettcher and Arthur C. Johnson, both of Chicago, of counsel; Brown, Jackson, Boettcher & Dienner, of Chicago, Ill., and M. B. & H. H. Johnson, and John T. Scott, all of Cleveland, Ohio, on the brief), for appellee.

Before ALLEN, MARTIN, and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This suit originated as a petition for declaratory judgment instituted against appellee, assignee of Mayo patent No. 2,322,041, by appellant, assignee of Sperry patent No. 2,353,274, asking that the court declare the right of appellant to manufacture cer-

tain specified automobile heaters without interference from the appellee, and hold the Mayo patent invalid, or not infringed. The appellee in its answer and counterclaim asserted the validity of Mayo, and alleged infringment of the Mayo patent by appellant. The District Court held Mayo patent No. 2,322,041, for automobile heating apparatus, valid as to all claims and infringed as to all claims except claim No. 11. Appellant contends that Mayo is clearly invalid for lack of the precise description required by § 4888, R. S., 35 U.S.C.A. § 33, and for lack of patentable invention. In the alternative, it contends that if Mayo is valid, appellant's devices do not infringe.

The subject-matter involved is a combination automobile heater and windshield defrosting device, claimed by both parties to be covered by their respective patents. Both the Mayo and Sperry heaters use a radiator heated by the fluid from the cooling system of the internal combustion engine, and two fans driven by a single motor, one fan being of the propulsion type for supplying a large volume of heated air to the compartment to be heated, and the other being of the blower, or centrifugal type, for supplying a relatively smaller volume of air at a higher pressure to the surfaces to be defrosted. The propulsion fan forces a large volume of air through the radiator core into the compartment to be heated, and the centrifugal fan pulls a smaller volume of air from the compartment through the radiator core for delivery to the windshield. Both heaters pass the air over the radiator coils in two opposite directions simultaneously, and have a Y conduit to convey the heater air to each side of the windshield. In the Mayo heater the two fans are on the same shaft, separated by the motor. The suction fan for the windshield draws the air from a strip at the side of the radiator, and does not use the dead air space around the hub of the blower fan. In the Sperry device the propulsion fan is mounted on a ring in which the suction fan is placed directly back of the propulsion fan, and in front of the motor. Sperry thus uses the dead area around the hub of the blower fan and attains compactness. In fact the chief evident difference between the two devices is that Sperry is more compact than Mayo.

The Mayo application was filed March 28, 1936, and a number of claims were held by the Patent Office to be allowable before Sperry filed his application on March 20, 1937. An interference, No. 73,751, was declared December 17, 1937, between Mayo, Aufiero, and Will and Fink, to which Sperry and others became parties. Sperry testified at the hearing on priority that his invention was conceived and reduced to practice in 1935, although the date of conception set forth in his numerous preliminary statements was January 10, 1936. The examiner of interferences found that while Sperry's idea was conceived in 1935, it was not reduced to practice prior to March 28, 1936, the filing date of the senior party Mayo; that Sperry clearly did not exercise reasonable diligence between March 28, 1936, and March 20, 1937, and therefore awarded priority to Mayo. This finding was sustained by the Board of Appeals of the Patent Office, and by the Court of Customs and Patent Appeals. Sperry v. Aufiero, 134 F.2d 174, 30 C.C.P.A., Patents, 908.

Three other interferences to which Mayo was not a party, 75,056, 75,057, and 75,058, covering separate and distinct features not involved in 73,751, were later declared between Sperry and others. At the trial of the priority issue Sperry introduced evidence, somewhat amplified, of the same experiments, with the same models and devices, as had been introduced in 73,751, together with additional exhibits. The examiner made a ruling similar to that in 73,751, namely, that while the evidence established conception in 1935, it did not establish reduction to practice, and therefore he awarded priority to Payne, senior party in interferences 75,056 and 75,057, and to Teschner, junior party in 75,058.

The Board of Appeals affirmed the decision of the examiner of interferences, but the Court of Customs and Patent Appeals reversed these decisions (Sperry v. Payne, 141 F.2d 816, 31 C.C.P.A., Patents, 942), holding that the evidence established Sperry's reduction to practice in 1935 by adequate testing of his models, and awarded priority to Sperry.

964

In the instant case the appellant offered the records of interferences 75,056, 75,057 and 75,058 in evidence; but the District Court held them to be immaterial and irrelevant to the issues of the case, upon the ground that the subject-matter of the last three interferences was other than that involved herein, and the parties were not identical. This ruling is assigned as error, and we consider it at the outset, for the decision of this question has a fundamental bearing on the outcome of the case. If this record shows that Sperry was in fact prior to Mayo both in conception and in reduction to practice, then the judgment of the District Court may be erroneous, depending on whether Sperry's disclosure is the same as Mayo's. The final ruling of the Court of Customs and Patent Appeals (141 F.2d 816) on the question of priority between Sperry, Payne and Teschner, does not bind this court, since Mayo was not a party to those proceedings. Cf. Rousso v. First National Bank, 6 Cir., 37 F.2d 281; Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163. It would, however, be persuasive if relevant and if based upon the same evidence as that presented here.

We think the District Court did not err in rejecting the evidence as to interferences 75,056, 75,057 and 75,058. The coincidence that the Court of Customs and Patent Appeals in those cases gave a decision contrary to its decision in 73,751, based upon evidence very similar to that presented in 73,751, could in no way bind Mayo, who was not a party to the latter interferences. The counts involved different, although related, subject-matter. Also, though we give careful consideration to the findings of fact of this expert court, we have before us testimony not previously introduced which, if it had been before the patent tribunals, might have changed the decision of the Court of Customs and Patent Appeals in the last case (141 F.2d 816). The evidence here is far from carrying that "thorough conviction" in character and amount which would require us to follow the decision in the case last cited. Rousso v. First National Bank, supra.

This evidence relates to the bakelite blower which was a part of Sperry's Exhibit No. 1. Sperry testified that this was the first model made to test the invention stated in his preliminary statement to have been conceived January 10, 1936. In interference 73,751, the record of which was introduced herein, Sperry testified that in this first model he used a pair of blowers acquired from a bakelite molding company, the Midwest Molding & Manufacturing Company of Chicago (hereinafter called Midwest). He stated that he started to make the model between September 5th and September 21st, 1935. Two witnesses corroborated Sperry's testimony, stating that they worked on Exhibit 1 in September, 1935.

In the instant case three witnesses, for the first time, testified as to the making of the bakelite blower. Sperry stated that Midwest supplied the blowers to a Chicago concern which made heaters for the B. F. Goodrich Company, and Richards, a representative of Midwest, testified that the Chicago Manufacturing Company was its customer on this job. Marty, of the Chicago Manufacturing Company, said that his concern purchased bakelite blowers from Midwest and sold some to the B. F. Goodrich Company. Richards stated that on May 29, 1936, Midwest ordered a plastic mold from a toolshop owned by Arthur Weis in Chicago. Only one plastic mold was made for Midwest, and this was the only one ever made by Weis. It was paid for by Midwest in the latter part of 1936, as shown by numerous clerical items introduced in evidence, taken from the files of Midwest, the Weis concern, and the Chicago Manufacturing Company. The exhibits include a bill for the steel which went into the mold, paid by Midwest, and the job sheet dated June 30, 1936, which shows the price paid by Midwest for the mold. The first samples of the mold were made July 16, 1936. Midwest had never seen a blower of this type before. It was the first job that Midwest had done for the Chicago Manufacturing Company, and Midwest had never previously made any plastic wheels. The mold was delivered July 20, 1936. The bill

for the mold was dated September, 1936, and the wheels made on the mold by Midwest were shipped in September of that year. Two bakelite wheels, made by Midwest, introduced in evidence, appear to be of material and structure identical with that of Sperry's Exhibit No. 1. Weis billed Midwest for the molds, and Midwest in turn billed the Chicago Manufacturing Company.

The orders, invoices, etc., covering this transaction in general are dated 1936. No paper covering the transaction purported to have been issued in 1935, and May 29, 1936, is the earliest date given. Richards, Weis, and Marty completely corroborated each other and their testimony was uncontroverted. Appellant introduced no evidence as to this matter except the records of the interferences. Sperry was dead, but none of the men who testified for him at the interference proceedings were called, although Peto and Golick were still working for appellant. Appellant's president, who succeeded to Sperry's duties as general manager, was called as a witness by appellee. He not only declared that he knew nothing of the sketches referred to by Sperry in his preliminary statement, but he proved an extremely evasive witness. While appellant claims that it has been making the Sperry heater since 1935, and appellee concedes its manufacture after 1943, there is no proof of the extent or the first date of manufacture except that one of appellant's witnesses, when questioned on the point, did not deny, and in effect conceded, that the first Sears Roebuck catalogue advertising appellant's device was published in May, 1937.

We think the testimony of the three disinterested witnesses as to the manufacture of the blower mold and the blower wheels which were a part of Sperry's first experimental model, supported by the documentary evidence from three independent companies, proves that Sperry's story of reduction to practice in 1935 is a mistake. Sperry was very experienced in the filing of patents, having applied for "probably a hundred and twenty-five of them." During 1936 he filed applications for four other patents, all relating to heaters in automobiles. Hence the workmen in his fac-

tory, having no written data to refresh their recollections, might have been honestly confused. Sperry's date of 1935 is supported by no drawings, by none of the sketches to which his affidavits refer, and by no documentary records of the dates of making, assembling, or testing the various Sperry exhibits. The vouchers, bills and orders from three different companies, here presented for the first time, dated 1936, are indubitably authentic. They not only support the award of priority to Mayo over Sperry in 134 F.2d 174, but they demonstrate from Sperry's own evidence that his conception, as well as his reduction to practice, was in 1936 instead of 1935. Exhibit No. 1, Sperry asserted, was his first experimental model. He says that on September 21, 1935, he told Peto he had "a new scheme for a heater." He fixed the time by the fact that this was two weeks after he made the model, Exhibit No. 1. This is the only testimony as to date of conception. Since the first machine was actually made in the latter part of 1936, and since Sperry, so far as he dates his conception at all, places it in close time connection with the making of Exhibit No. 1, these facts militate strongly against the correctness of the second decision of the Court of Customs and Patent Appeals (141 F.2d 816).

This conclusion is supported by the fact that the several sworn preliminary statements filed by Sperry in the interference proceedings, contrary to his testimony, reiterate that he conceived the idea and reduced it to practice in 1936. Sperry, under the well-established rule, was restricted to the dates of conception alleged in his preliminary statement. Hess v. Dreyfuss, C.C.P.A., 104 F.2d 801. Unquestionably the first device was made some time after September, 1936. Sperry did not prove conception earlier than the fall of 1936. We conclude that Mayo is prior to Sperry both in conception and in reduction to practice.

After Sperry had been successful in the second set of interferences he amended his specification, revised his claims, and was granted a patent on July 11, 1944. His application was dated March 20, 1937,

and Mayo's application was dated March 28, 1936. Mayo's patent was granted June 15, 1943.

We therefore have a situation in which the owner of the Sperry patent, which was applied for a year later than the Mayo patent, asks to have the Mayo patent declared invalid. The owner of the Mayo patent asks the court to hold that appellant's devices, found by the District Court to be manufactured in accordance with Sperry, infringe the Mayo patent.

Appellee concedes that appellant's device is manufactured under the Sperry patent. Appellant concedes that its heater and the Mayo heater both give the precise result of blowing high pressure reheated air to the windshield of the automobile. The only expert testimony in the record shows that both devices function in the same way and give the same results. Appellant concedes in effect that claims 5, 6, and 7 of Mayo are infringed if the claims are valid and if the "means clauses" cover Sperry's structure. It also concedes that claim 13 of Mayo is infringed in terms "if restricted to the structure set forth in the claim."

The appellant introduced no testimony. No explanation is given in the evidence of the claimed substantial differences upon which appellant relies to establish the defense of invalidity of Mayo and non-infringement. The assertions in appellant's brief are not testimony, and are in certain respects not supported by the record.

We agree with the District Court that the Mayo patent is clearly valid. It was old to heat the passenger compartment of an automobile with air warmed by the heat of the engine, radiated by the propulsion fan, and moving in a single path; it was old to convey heated air to the windshield for the purpose of defrosting. But the Mayo device is a highly integrated unit operated by a single motor which produces two currents of heated air directed simultaneously in different directions, the elements coacting in performing the functions of both heater and defroster. This combination was new.

Appellant claims that the use of the term "means" in claims 5, 6, 7, 8, 9, 10, and 12 of Mayo invalidates them under the decision in Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S. Ct. 6, and § 4888, R.S. This case held that a claim which describes the most crucial element in a "new" combination in terms of what it will do rather than in terms of its own physical characteristics or its arrangement in the new combination is invalid as a violation of § 4888, R.S. There the patent described in terms of function the acoustical resonator which was the principal feature of the claimed new combination for determining the location of an obstruction in an oil well. Mayo, in the seven claims in question, uses such terms as "means for supporting" the casing "within the body of an automobile;" "means for heating air;" "means for admitting air;" "means for guiding air." Such phrases refer to simple and well understood mechanical contrivances which could hardly be called crucial elements in the combination. They are clearly defined by the specification and drawings. We think the Halliburton case was not intended to eliminate the use of such convenient and uniformly understood descriptions. Claims 5 and 7 were suggested by the Patent Office in interferences.

Claim 6 is plainly too broad to comply with the requirements of § 4888, R.S.; but claims 5, 7, 8, 9, 10, and 12 are valid.

All claims of Mayo, including claims 1 to 4, inclusive, which are conceded by appellant to be definite and not to fall within in the condemnation of the Halliburton case, supra, are asserted by appellant to disclose no patentable invention over the prior art. In support of this contention appellant introduced 76 patents in evidence without expert discussion or explanation of any kind. Appellant relies chiefly upon Caesar reissue patent, 17,131, and Harrison, 2,011,856, which were not before the Patent Office. It says that Mayo functions exactly the same and produces exactly the same results as would the prior art heaters of Caesar and Harrison, "when merely placed (as they were) in the same compartment of an automobile." The record does not show that Caesar and Harrison were ever placed in the same compartment of an automobile, and it would be impracticable to do so. Both Caesar

and Harrison have single fans. Caesar simply delivers hot air to the passenger compartment. Harrison contemplates delivering hot air to the passenger compartment and directing some of it to the windshield so that it would be a substantial duplication of functions to put both Caesar and Harrison in the same car. While Harrison attempts defrosting, it has a single fan, with a casing which discloses a series of openings around the periphery. This fan is incapable of building up pressure, as is done by the centrifugal fan of Mayo. This fact is recognized by the statement in the Harrison specification that the device distributes heated air in "substantially all directions."

Three other patents besides Caesar and Harrison were relied on as not having been cited in the Patent Office. These patents are similar to those which were cited, and add little to the consideration. Gould, 1,676,021, is an exhaust heater. It does not try to defrost. Rice, 2,026,655, has two propeller fans in two adjacent compartments. They are non-centrifugal, and no attempt is made to heat the windshield. The purpose is to provide a large air flow, increased heat and a high flow of air from the heater. Mullen, 1,951,200, claims as its particular novelty the fact that its one fan heater is mounted under the front seat. These patents are typical of the lack of relevance in most of the patent citations. It is strenuously urged that Askin, 1,907,032, Hueber, 1,996,019, and Howell, 1,704,971, anticipate Mayo; but all of these were before the Patent Office not merely as citations in ex parte proceedings, but in contested interferences, and were considered not to anticipate. None of them covers Mayo's device, and none of them is capable of being used in Mayo except by a radical change of some essential element.

Mayo's claims and specification were subjected to a special scrutiny in the Patent Office. Interference proceeding 73,751, in which Mayo was awarded priority over Sperry, involved several other claimants, and also embodied two other interferences which had been consolidated. The Patent Office suggested certain counts in interference which formed the basis of six claims of Mayo. Priority was not the only question considered in this interference proceeding. Motions were made to exclude both Mayo and Will and Fink on the ground that their disclosures did not fall within the interference counts. A motion to dissolve for lack of patentable invention was made and overruled, and a motion was made and sustained to add certain counts. The allowance of Mayo's patent on June 15, 1943, came not merely as the result of ex parte proceedings, but after hotly contested litigation with numerous parties represented by experienced counsel and extending over some six years.

Mayo's device is not an aggregation. It is a single unit comprising one heater and one radiator mounted in a single casing, with two fans operated by the same motor. The air heated for the passenger compartment is reheated and sent under increased pressure to the windshield. The simultaneous attainment of two results by a single coacting mechanism which creates two specific currents of air, different both in volume and in pressure, is evidence not of aggregation, but of true combination. The integrated Mayo machine immediately received the approval of the industry, over a million heaters having been manufactured up to 1941 when production ceased during the war. Although appellant contends that it had extensive commercial success with the Sperry heater, no evidence of this is introduced in the record.

The Sperry device achieves results identical with Mayo. As to claims 5, 7, and 13 (printed in the margin),[1] appellant concedes in effect that its device infringes. The District Court, which heard the evi-

---

[1] Claim 5. "In an apparatus of the class described, the combination of a casing, means for supporting the same within the body of an automobile, a radiator mounted in said casing, means whereby said radiator may be connected with the hot water circulating system of said automobile, a duct carried by said casing and leading to a point adjacent the windshield of said car, discharge openings in said casing adjacent said radiator, and means within said casing for propelling air through said radiator and said discharge openings into the body of the car, and simultaneously propelling a portion of the air which is passed through

dence, including demonstrations of the Sperry device by an expert, found that all claims in issue are infringed. With this conclusion we are in accord. Appellant's claimed use of the dead space at the hub of the impeller fan is a nonradical improvement, so far as this record shows, affecting the compactness of the device. It no doubt originated with Payne, 2,356, 609, as it is fully described in his specification, filed in the Patent Office almost a month before Sperry, and is precisely described in his claims. This feature was emphasized by Sperry after he won over Payne in the Court of Customs and Patent Appeals (141 F.2d 816), the paragraph of the Sperry specification which covers it having been added by amendment in May, 1944. But the gain in compactness is a matter of degree only, and it is achieved by a construction which is within the expected skill of the art. It does not avoid infringement.

The judgment of the District Court is reversed as to claim No. 6 of Mayo patent 2,322,041. In all other respects the judgment is affirmed.

said radiator through another portion of said radiator and thence through said duct."

Claim 7. "In an apparatus of the class described the combination in an automobile heater having means for heating air and for circulating it through the body of the car, of means for further heating a portion of said air heated by said first-mentioned means, and discharging the same against the surface of the windshield of said car, said means comprising an auxiliary heating surface, a duct leading from said surface to a point adjacent said windshield, and means for impelling air from said first named heater in contact with said auxiliary surface and through said duct into contact with the windshield."

Claim 13. "An automobile heater comprising a unitary framework adapted to be mounted in the passenger compartment, a radiator carried by said framework, connections for said radiator whereby hot water may be circulated therethrough, a motor mounted on said framework within the bounding planes thereof, a centrifugal blower element comprising blades carried on the shaft of said motor and operating in a blower scroll housing having a restricted outlet exclusive to itself, whereby air which has passed through said radiator and to said blades is discharged from said housing at relatively high pressure, a conduit for conveying said high pressure air from said outlet to a remote relatively small area, and a fan element comprising propeller blades carried on said shaft of said motor and confronting a relatively large area of said radiator, whereby a relatively large volume of air is thereby moved axially and circulated at relatively low pressure through said radiator for heating said passenger compartment."